**UNITED STATES of America,
Appellee,**

**v.**

**Manuel GONZALEZ, Appellant.**

**No. 319, Docket 73–1932.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 25, 1973.

Decided Dec. 6, 1973.

Alfred Lawrence Toombs, New York City (Michael P. Direnzo, New York City, of counsel), for appellant.

Raymond J. Dearie, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty. E. D. N. Y., of counsel), for appellee.

Before SMITH, FEINBERG and OAKES, Circuit Judges.

J. JOSEPH SMITH, Circuit Judge:

Appellant Manuel Gonzalez was convicted after a trial by jury in the United States District Court for the Eastern District of New York, Mark A. Costantino, Judge, on one count of conspiracy and one count of smuggling cocaine into the United States, in violation of 21 U. S.C. § 952(a) and 18 U.S.C. § 2. We find error in the trial and reverse.

The principals of this case first came to the attention of the authorities when on October 7, 1972, Jose Valenzuela-Correa, a sixty-three-year-old Chilean national, was searched following his arrival in the United States from Chile at John F. Kennedy International Airport in Queens, New York. He was found to have over four pounds of cocaine strapped to his legs. Correa agreed to cooperate with the authorities and stated that he was an intermediary between Mario Cerda, a business acquaintance of Correa's in Santiago, and a Mr. Gonzalez, whose address was 1511 Westchester Avenue, Bronx, New York. Correa stated that Cerda had given him an envelope which Correa was to give to Gonzales along with the drugs. Upon inspection the letter was found to be a letter of introduction, referring to Correa as "the bearer of your order." It also spoke of future orders but did not identify any of these "orders" as involving narcotics. The envelope also contained the halves of two different dollar bills cut in a zig-zag manner. Correa told customs officials that Cerda had instructed him not to deliver the drugs until he was shown the corresponding halves of the bills and that Cerda told him that Gonzalez would give him $300 in expense money at their initial meeting.

Correa's subsequent meeting with appellant Gonzalez on the night of October 7, at a bar owned by Gonzalez at the Westchester Avenue address, was under surveillance by special agents. The officers observed Gonzalez greet Correa, look briefly at the letter Correa gave him, and walk to the rear of the bar where Gonzalez disappeared from view. A short time later, an agent who pretended to be using the bathroom saw appellant speaking with a black man and giving him a sum of money. Gonzalez then stood in the rear of the bar, apparently reading from a piece of paper. Appellant next returned to Correa and gave him the matching halves of the bills contained in the envelope. Correa

testified that Gonzalez then advised him that an individual would pick up the cocaine the next day at Correa's room in the Yonkers Motor Inn. Correa asked Gonzalez for the expense money, and Gonzalez gave him $300. The surveilling agents testified to all the above, except the conversation between Correa and Gonzalez.

The first arrest in this case was made when Bolivar Irizarry came to Correa's room the next day. Irizarry showed Correa the same halves of the bills that Correa had given Gonzalez the day before and also presented to Correa a Yonkers Motor Inn card that Correa had given Gonzalez. When Irizarry began examining the cocaine, the special agents emerged from the bathroom and placed him under arrest.[1] Appellant Gonzalez was arrested outside his bar later that day. Mario Cerda was named in the indictment as "John Doe, also known as Mario C."

The defense claimed that Gonzalez believed the transaction involved shoes, not cocaine. Appellant testified in his own behalf that in February, 1972, he and Mario Mena Flores, a Chilean national who frequented Gonzalez' bar, had agreed to begin marketing in New York shoes which Flores made in Chile. Gonzalez and Flores further agreed that one Ricardo Gonzalez, apparently no relation of appellant's, was to be a partner in the venture and that Flores would send a shipment of shoes to New York as a sample. Appellant testified that Ricardo Gonzalez told appellant one week before Correa's arrival in New York that Flores would soon arrive in New York. Appellant contended that Correa introduced himself as being sent by "Mario," whom appellant took to be Mario Flores, that appellant showed the letter Correa

gave him to Ricardo Gonzalez when appellant went to the rear of the bar and that Ricardo Gonzalez gave appellant the two halves of the dollar bills, telling him that they belonged to Correa. Appellant also testified that he gave Correa's motel card to Ricardo Gonzalez who said that he would pick up the shoes. Appellant denied having discussed narcotics with Correa and stated that he had not seen Ricardo Gonzalez since the night of October 7 although he had tried resourcefully to contact him.

There was an abundance of evidence to justify the jury's decision that appellant was engaged in a narcotics transaction, not in a retail shoe venture, and indeed appellant does not challenge the sufficiency of the evidence on appeal. We upset the conviction with regret, but we are compelled to do so by errors affecting the fairness of the trial.

Appellant's first claim on appeal is that the charge to the jury was so inconsistent and confusing as to require reversal. The objection concerns that portion of the charge relating to Correa's testimony.

■ Correa, an accomplice witness against appellant, was clearly an important figure in the trial below. His motivation for testifying was an important factor in judging his credibility, and defense counsel questioned Correa about his motivation on cross-examination.[2] Defense counsel seasonably requested that the trial judge charge substantially in the language of United States v. Padgent, 432 F.2d 701, 704 (2d Cir. 1970):

An accomplice's testimony implicating a defendant as a perpetrator of a crime is inherently suspect for such a witness may well have an important personal stake in the outcome of the

---

1. Irizarry pled guilty to conspiracy prior to trial.

2. Appellant contends on appeal that the trial judge improperly restricted his cross-examination of Correa with respect to Correa's motivation, in violation of the rule as stated in United States v. Blackwood, 456 F.2d 526, 530 (2d Cir.), cert. denied, 409 U.S. 863, 93

S.Ct. 154, 34 L.Ed.2d 110 (1972). In light of our disposition of appellant's argument concerning the charge, we need not address this point. We assume, however, that on any retrial the court will permit full exploration of Correa's possible motives in testifying, without interrupting to say that the court has made no promises.

trial. An accomplice so testifying may believe that the defendant's acquittal will vitiate expected rewards that may have been either explicitly or implicitly promised him in return for his plea of guilty and his testimony.

Instead, the trial judge charged:

A participant so testifying may believe the defendant's acquittal will vitiate expected rewards that may have been explicitly or implicitly promised in return for his testimony, which is not true in this case.

This Court has made no promises to this defendant that testified in this case. I cannot say that too strongly. However, I must charge that to you.

A few sentences thereafter, the trial judge stated that " . . . what I said about scrutinizing participants' testimony with particular care and caution, and that goes to all witnesses. . . ." Defense counsel did not except to this portion of the charge when it was given.

Appellant contends that the charge was "incomprehensible" and "obviously confusing at best," and that it constitutes "plain error," citing United States v. Clark, 475 F.2d 240, 248–250 (2d Cir. 1973) and United States v. Fields, 466 F.2d 119, 120–121 (2d Cir. 1972). We must agree that the court's dilution of the usual accomplice charge must have left the jury confused on the point.

Appellant's second argument on appeal concerns the prosecutor's summation. He objects to alleged misrepresentations of facts in evidence, the use of inflammatory epithets, and efforts to interject the prestige of the government and the prosecutor's veracity in order to bolster the case.

■ The summation at issue contained a host of infirmities; we will not attempt to catalogue them. Among the most prejudicial of the misrepresentations was the prosecutor's char-

acterization of appellant as a "repeated junk dealer." There was nothing in the evidence to support this statement. The prosecutor opined that " . . . you have to be born yesterday to believe . . ." appellant's defense, that appellant's testimony " . . . . is so riddled with lies that there is only one word that comes out of his testimony: guilty, guilty, guilty," and that appellant was " . . . caught dead to rights . . . red-handed." The prosecutor characterized appellant's defense as a "pack of lies," "an insult to your intelligence," and "a concocted defense." Furthermore, he made derogatory comments about appellant's trial counsel's *successful* objections to evidence.

This is consistent with a repeated pattern of misconduct by this prosecutor. *See,* United States v. Drummond, 481 F. 2d 62 (2d Cir. 1973); United States v. Miller, 478 F.2d 1315 (2d Cir. 1973); and United States v. Fernandez, 480 F. 2d 726, 741 (2d Cir. 1973).[3] Moreover, these comments were unprovoked, and defense counsel objected several times to the summation. Most significantly, the remarks in question were neither trivial nor few. *Compare* United States v. White, 486 F.2d 204 (2d Cir. 1973).

While either of appellant's arguments, concerning the charge and the summation, might be sufficient to reverse the decision below, the combination of the two requires that disposition. Of course, appellant is entitled only to a fair trial, not to a perfect trial. But we think that the confusion which the charge must have created coupled with the passion and the prejudice which the summation likely aroused raises grave doubts about the fairness of the proceeding below.

Appellant's two remaining arguments are relevant to a new trial, and therefore merit discussion.

The first arises from the discrepancy between the affidavit upon which the

3. It is appropriate to note that the prosecutor who authored the summations in *Fernandez, Miller, Drummond,* and in the pro-
ceedings below is no longer with the criminal division of the United States Attorney's Office of the Eastern District of New York.

search warrant was based and the testimony of the affiant, Agent Keefe, at the suppression hearing. Allegation six in the affidavit stated that Gonzalez was arrested "while in possession of a key to the above specified Safe Deposit Box," i. e., the box which was the subject of the warrant. At the hearing, Keefe stated that when he took the key from Gonzalez he was not certain that it was a safe deposit box key, that he then investigated to determine whether Gonzalez had a safe deposit box at a bank near his bar, and that upon determining that Gonzalez did have such a box Keefe applied for the search warrant without first checking whether the key he obtained from Gonzalez actually did fit that box. Thus, when Keefe applied for the warrant, he did not actually know that the key did fit the box. As it turned out, the key did not fit the box which was searched.

Appellant asks us to hold the warrant invalid and to suppress the evidence seized as a result of the warrant under the rationale of a line of cases from other circuits. United States v. Morris, 477 F.2d 657 (5th Cir. 1973); United States v. Jones, 475 F.2d 723 (5th Cir. 1973); United States v. Upshaw, 448 F.2d 1218 (5th Cir. 1971), cert. denied, 405 U.S. 934, 92 S.Ct. 970, 30 L.Ed.2d 810 (1972); United States v. Harwood, 470 F.2d 322 (10th Cir. 1972); United States v. Roth, 391 F.2d 507 (7th Cir. 1967). These cases stand for the proposition that when the truthfulness of the facts underlying a warrant has become suspect, the warrant will be set aside and the evidence derived from it suppressed where there is a showing that the affiant has made a material and knowing misstatement in the affidavit.

Appellant also relies on Kipperman, Inaccurate Search Warrant Affidavits

as a Ground for Suppressing Evidence, 84 Harv.L.R. 825 (1971). Kipperman identifies five variables: the misstatement may be material or immaterial; it may be innocent, negligent, or deliberate. He suggests that proper application of Fourth Amendment values requires setting aside the warrant if it is based on purposeful misstatement regardless of the materiality of that statement, also setting it aside if the misstatement is both negligent and material, and upholding the warrant in other cases.[4] The Seventh Circuit has recently adopted a rule quite similar to this test. United States v. Carmichael, 489 F.2d 983 (7th Cir. 1973) (en banc). Carmichael follows the Kipperman analysis except that it voids warrants where the misstatements are both recklessly untruthful and material, not when they are only negligently false and material.

Prior case law in this circuit speaks to this issue only in passing. In United States v. Bozza, 365 F.2d 206, 223–224 (2d Cir. 1966), the court appeared to say that a negligent misstatement would upset a warrant only if that misstatement was material. In United States v. Perry, 380 F.2d 356, 358 (2d Cir.), cert. denied, 389 U.S. 943, 88 S.Ct. 307, 19 L.Ed.2d 299 (1967), the court stated that it is sufficient support for a warrant that " . . . the facts alleged by the informant, if true establish illegality and the affiant-agent has reasonable grounds for believing in the truth of the allegations." In United States v. Suarez, 380 F.2d 713, 716 (2d Cir. 1967), the court stated in dicta that "[i]t may be that testimony at trial could so clearly demolish statements in an affidavit supporting a warrant, that a prior denial of a motion to suppress would be overruled." In United States v. Sultan, 463 F.2d 1066, 1070 (2d Cir. 1972), the

---

4. Kipperman would apply his test to all search warrants whose underlying facts were challenged. Since a hearing was in fact held below on the existence of factual inaccuracies in the warrant, this case does not raise the question of when an evidentiary hearing must be had where the affidavit and warrant are valid on their face. See Rugendorf v. United States, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); United States v. Sultan, 463 F.2d 1066 (2d Cir. 1972); and United States v. Dunnings, 425 F.2d 836 (2d Cir.), cert. denied, 397 U.S. 1002, 90 S.Ct. 1149, 25 L.Ed.2d 412 (1970).

court suggested that a material and knowing misstatement would upset a warrant.

■■ Whichever standard we apply here, the warrant must be upheld and the evidence admitted. Under the material misstatement test, a critical issue is materiality. Appellant points to Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), as authority for his position that the warrant would not have been issued absent the misstatement. In *Henry*, the Court held that probable cause did not exist where police who were investigating a theft from an interstate shipment of whiskey twice observed cartons being placed in a car in a residential district. Here, on the other hand, appellant was already under arrest for participating in a narcotics transaction and there was probable cause to search Gonzalez' box whether the key fit or not. Moreover, the police in *Henry* acted without a warrant, whereas this search and seizure was conducted pursuant to a warrant. United States v. Ventresca, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965).

Here, appellant's use of the safe deposit box was determined by investigation. The connection between the deposit box and the narcotics transaction was inferred from expert experience and Gonzalez' possession on the day of the transaction of a safe deposit box at a nearby bank and of a key which appeared to be a safe deposit box key. The evidence here, exclusive of the misstatement as to the key, was sufficient to establish probable cause. And since the misstatement was not material, the warrant survives the material misstatement test. The misstatement was at most a negligent misrepresentation. The warrant therefore survives the stricter test suggested by Kipperman op. cit. *supra*.

The evidence derived from the warrant in question may properly be admitted.

■■ Appellant's final argument is that he should have been permitted to take the deposition of a foreign national pursuant to Fed.R.Crim. P. 15(a).[5]

Shortly after his arraignment, appellant made a motion pursuant to Rule 15(a) to take the deposition abroad of "Mario Menna." As noted, appellant has contended throughout that he, Ricardo Gonzalez and Mario Mena Flores were engaged in a retail shoe venture. In affidavits in support of his Rule 15(a) motion, appellant stated that "Menna" was Mario Mena Flores and that Flores was willing to be deposed but unwilling to travel to the United States to testify. Appellant's affidavits further stated that Flores had told defense counsel in Chile that Flores and appellant were planning a retail shoe business, that Flores had given Correa a letter of introduction to appellant, but not the one that later was introduced at trial. Judge Costantino denied appellant's motion, stating that Flores was not unable to attend trial or prevented from attending but that Flores was unwilling to attend because he did not want to expose himself to criminal liability since it was most probable that he was the co-defendant in this case "John Doe, also known as Mario C."

While the court below probably acted within the scope of its discretion in denying the motion to depose, United States v. Soblen, 203 F.Supp. 542 (S.D. N.Y.1961), aff'd, 301 F.2d 236 (2d Cir.), cert. denied, 370 U.S. 944, 82 S.Ct. 1585, 8 L.Ed.2d 810 (1962), we believe the wiser course would have been to grant the motion. *See*, United States v. Hayutin, 398 F.2d 944, 954 (2d Cir.), cert. denied, 393 U.S. 961, 89 S.Ct. 400, 21 L.

---

5. Rule 15(a) states in relevant part:
   If it appears that a prospective witness may be unable to attend or prevented from attending a trial or hearing, that his testimony is material and that it is necessary to take his deposition in order to prevent a failure of justice, the court at any time aft-

er the filing of an indictment or information may upon motion of a defendant and notice to the parties order that his testimony be taken by deposition and that any designated books, papers, documents or tangible objects, not privileged, be produced at the same time and place.

Ed.2d 374 (1968), and United States v. Bentvena, 319 F.2d 916, 941 (2d Cir.), cert. denied, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963). Although there was substantial evidence before the trial judge identifying Flores as the co-defendant and thus in a sense as a fugitive from justuce,[6] we do not think that this fact is dispositive. Whatever value this type of "exculpation" has to the fugitive co-defendant, the defendant should not be deprived of testimony which would be available by deposition. The testimony of a fugutive from justice is rightly suspect, but not solely because of the lack of the perjury sanction. The jury is well able to weigh such testimony and in this case it might be better to let it be taken.

For the reasons expressed, we reverse and remand for new trial.

---

6. The lack of an allegation in the record that Flores was unable to attend the trial and the identification of Flores as a "witness also joined herein as a defendant" in appellant's motion papers both point to this conclusion. Indeed, at trial defense counsel admitted this identity.